NORTHERN TRUST COMPANY, a Corporation, v. JOHN BRUEGGER and the News Printing Company, a Corporation.

(159 N. W. 859.)

Action on a promissory note for $5,000 by Bruegger as maker to the News Printing Company, payee, dated in May, 1910, and indorsed to plaintiff. *Held*:

**Jury — findings of — promissory note — delivery of — escrow agreement — evidence — sufficiency.**

1. Evidence is sufficient to sustain the findings of the jury that the note was delivered to one Hollister, managing officer of both the payee and plaintiff corporations, and under an escrow agreement, and that the delivery to the payee by the holder in escrow was made in disregard of and contrary to and without compliance with the terms of the escrow agreement.

**Promissory note — delivery of — in law.**

2. A delivery so made constitutes in law no delivery of the instrument.

**Promissory note — escrow agreement — compliance with — delivery not so made — note void — evidence.**

3. Under such findings the instrument never was delivered and has been void *ab initio*, and the evidence offered by defendant to establish the escrow agreement was admissible.

Note.—On necessity of strict compliance with conditions of escrow agreement, see note in L.R.A.1916A, 502.

**Escrow agreement — waiver of conditions — estoppel — defense — evidence.**

4. Bruegger has not waived the conditions of the escrow agreement, nor estopped himself from asserting it as a defense.

**Promissory note — conditions of execution and delivery — may be shown — correspondence — explained by oral testimony.**

5. The correspondence soliciting the note and transmitting it to the holder in escrow discloses that it is but part of and supplementary to the conditions under which the note was executed and was to be delivered. The correspondence can therefore be explained and supplemented in such particulars by oral testimony.

**Controverted facts — findings of jury — conclusive.**

6. A controverted question of fact as to the existence of an escrow agreement and as to its conditions was presented, and the verdict of the jury thereon is conclusive on this review of error.

**Issues — newspaper — financial condition — stock — worthlessness of — holding company — evidence as to — admissible.**

7. Evidence received as to the financial condition of the newspaper plant involved and the worthlessness of the stock of the holding company owning and operating it was admissible under the issues tendered by the pleadings.

**Contract — rescission of — election as to defenses — motion to compel — issues — must be confined to.**

8. No question of rescission of a contract was involved, and the motion to require defendant to elect as to defenses was properly denied.

**Instructions — requested and refused — issues — fairly submitted.**

9. Instructions requested and refused, and those given and challenged as error and argued in the brief examined and held to fairly submit the issues of fact and to be nonprejudicial.

**Statements of counsel — argument to jury — erroneous — new trial — not ground for.**

10. Statements of counsel in argument to the jury do not warrant the granting of a new trial.

**Instructions — directing jury to find for plaintiff — equivalent to granting motion therefor — rights of defendant — not prejudiced thereby.**

11. The court at the close of the testimony denied a motion to direct judgment against the News Printing Company, codefendant, but instead, in its instructions, required the jury to find in any event for the plaintiff and against the News Printing Company for the amount claimed. This action did not prejudice defendant's rights, and is the equivalent of the granting of a motion for a directed verdict.

**New trial — affidavits on motion for — surprise — newly discovered evidence — insufficient — properly denied.**

12. The showing for a new trial on affidavits, on the grounds of surprise and newly discovered evidence, was insufficient, and denial of the motion was proper.

**Substantial error — not shown — judgment — affirmed.**

13. No substantial or prejudicial error is shown, and the judgment appealed from is affirmed.

Opinion filed October 10, 1916.

Appeal from the District Court of Cass County, *Pollock,* Judge.
Affirmed.

*Pierce, Tenneson, & Cupler,* for appellant.

To constitute an escrow the instrument must be delivered to a stranger. Delivery to any party to the instrument is complete delivery. The note is then valid, subject to counterclaim for damages for breach of any condition on which it was delivered. 11 Am. & Eng. Enc. Law, 337 et seq.; 16 Cyc. 573; Dils v. Bank of Pikeville, 109 Ky. 757, 60 S. W. 715.

If the proposed oral testimony is in any way inconsistent with the terms of the written instrument, it is wholly inadmissible. Elliott, Contr. § 1631.

If clear the language of the writing governs, and the intention of the parties must be ascertained from the written instrument. Rev. Codes 1905, §§ 5342, 5343, 5348, Comp. Laws 1913, §§ 5898, 5899, 5904.

The only criterion of the completeness of a written contract as a full expression of the agreement of the parties is the writing itself. 17 Cyc. 673, 675, 715, 717, 746, 747; Samuel H. Chute Co. v. Latta, 123 Minn. 69, 142 N. W. 1048; Jones, Ev. §§ 454, 460.

The circumstances and situation of the parties may be shown by parol, but the language of the parties is excluded where inconsistent with the contract. Palmer v. Albee, 50 Iowa, 433; 9 Enc. Ev. 374–377; Tuttle v. Burgett, 53 Ohio St. 498, 30 L.R.A. 214, 53 Am. St. Rep. 649, 42 N. E. 427.

A contract which is voidable solely for want of due consent may be

ratified by a subsequent consent. Rev. Codes 1905, § 5309, Comp. Laws 1913, § 5865.

Or by acceptance of the benefits, so far as the facts are known, or ought to be known, to the party accepting. 8 Cyc. 65, note 61; Lee v. McClelland, 120 Cal. 147, 52 Pac. 300; Nounnan v. Sutter County Land Co. 81 Cal. 1, 6 L.R.A. 219, 22 Pac. 515; Rev. Codes 1905, §§ 5310, 6701 to 6703, Comp. Laws 1913, §§ 5866, 7288 to 7290.

Waiver and ratification cannot be alleged by a stranger to any contract, but may always be proved where the suit is between the parties to the contract, a breach of which is alleged. 16 Cyc. 789, 879, note 20, citing; Canale v. Copello, 137 Cal. 22, 69 Pac. 698; Crutchfield v. Hudson, 23 Ala. 393; Letcher v. Morrison, 27 Ill. 209; Hoit v. McIntire, 50 Minn. 466, 52 N. W. 918.

Where property held in escrow is wrongfully delivered, the transaction may be repudiated unless assent or ratification, with knowledge of the pertinent facts, follows. Daniels v. Cower, 54 Iowa, 319, 3 N. W. 424, 6 N. W. 525; Blight v. Schenck, 10 Pa. 285, 51 Am. Dec. 478; Langdon v. Brown, 160 Pa. 538, 28 Atl. 921; Jackson v. Lynn, 94 Iowa, 151, 58 Am. St. Rep. 366, 62 N. W. 704.

A person who knowingly receives and accepts the benefits of a contract or transaction may be estopped to question the existence, validity, and effect of the contract. 16 Cyc. 787; Lake Street Elev. R. Co. v. Carmichael, 184 Ill. 348, 56 N. E. 372; Lane v. Pacific & I. N. R. Co. 8 Idaho, 230, 67 Pac. 656; Collins v. Cobe, 202 Ill. 469, 66 N. E. 1079; Morris v. Ewing, 8 N. D. 103, 76 N. W. 1047; Rev. Codes 1905, §§ 5310, 6701–6703, Comp. Laws 1913, §§ 5866, 7288–7290.

If the defrauded party acquires knowledge of the fraud while the contract remains executory, and thereafter does any act in performance or affirmance of the contract, or exacts performance from the other party, he thereby condones the fraud and waives his right of action. 20 Cyc. 92; Fitzpatrick v. Flannagan, 106 U. S. 648, 660, 27 L. ed. 211, 215, 1 Sup. Ct. Rep. 369; Schmidt v. Mesmer, 116 Cal. 267, 48 Pac. 54; Kingman & Co. v. Stoddard, 29 C. C. A. 413, 57 U. S. App. 379, 85 Fed. 740; Simon v. Goodyear Metallic Rubber Shoe Co. 52 L.R.A. 745, and cases cited on page 747, 44 C. C. A. 606, 105 Fed. 573; 9 Cyc. 244; Omaha Lumber Co. v. Co-operative Invest. Co. 55 Colo. 271, 133 Pac. 1112.

A fraudulent intent is an essential element of fraudulent conceal-
ment. 20 Cyc. 36, note 40, 118, note 81.

In fraud cases the proof must be "clear," "satisfactory," "convinc-
ing." Ley v. Metropolitan L. Ins. Co. 120 Iowa, 203, 94 N. W. 570;
20 Cyc. 39, note 54; Sioux Bkg. Co. v. Kendall, 6 S. D. 543, 62 N. W.
377; Taylor v. Guest, 58 N. Y. 262.

There is no proof of the actual damages. Such proof as was offered
is largely speculative. Proof of damages must relate back to the day
of sale and purchase of the newspaper. Gunderson v. Havana-Clyde
Min. Co. 22 N. D. 329, 133 N. W. 554; Fargo Gas & Coke Co. v.
Fargo Gas & E. Co. 4 N. D. 219, 37 L.R.A. 593, 59 N. W. 1066;
Boddy v. Henry, 113 Iowa, 462, 53 L.R.A. 769, 85 N. W. 771.

Evidence of a partial failure of consideration cannot be offered
under an answer claiming a total failure of consideration. Nichols &
S. Co. v. Dallier, 23 N. D. 532, 137 N. W. 570; 8 Cyc. 162, 163.

If the instructions of the court fail to cover a material part of the
case, no request is necessary to preserve the right to claim error. Put-
nam v. Prouty, 24 N. D. 517, 140 N. W. 93; Rev. Codes, 1905, §
7021, Comp. Laws 1913, § 7620.

Where defenses are so inconsistent that the proof of one necessarily
disproves the other, a motion to compel election should be granted.
Murphy v. Russell, 8 Idaho, 133, 67 Pac. 426; Wendling v. Pierce,
27 App. Div. 517, 50 N. Y. Supp. 509; Seattle Nat. Bank v. Carter
(Seattle Nat. Bank v. Jones) 13 Wash. 281, 48 L.R.A. 771, 43 Pac.
331; 31 Cyc. 151, note 33.

It was error to permit counsel for defendant to comment on plain-
tiff's reasons for joining the printing company, as a defendant, and
to state that it was done to prevent a change of venue. 38 Cyc. 1492,
note 57-60, 1493, note 79-81, 1498; Keniston v. Todd, 139 Iowa, 287,
117 N. W. 674; Fry v. Bennett, 3 Bosw. 200, 28 N. Y. 324; Rasciot
v. Royal Neighbors, 18 Idaho, 85, 29 L.R.A.(N.S.) 441, 138 Am. St.
Rep. 180, 108 Pac. 1048; Neff v. Cameron, 213 Mo. 350, 18 L.R.A.
(N.S.) 327, 127 Am. St. Rep. 606, 111 S. W. 1139.

Where an officer of a corporation is interested in a note, his knowl-
edge will not be imputed to the corporation for which he is acting in
purchasing the note. 5 Cyc. 461; Lilly v. Hamilton Bank, 29 L.R.A.
(N.S.) 558, 102 C. C. A. 1, 178 Fed. 53; Mead v. Pettigrew, 11 S.

D. 529, 78 N. W. 945; Thompson v. McKee, 5 Dak. 172, 37 N. W. 367.

The court committed error in requiring the plaintiff to amend the complaint when the Northern Trust Company was substituted for the Northern Savings Bank. The law did not require or call for such amendment. Rev. Codes 1905, § 6820, Comp. Laws 1913, § 7408; 20 Enc. Pl. & Pr. 1062; 31 Cyc. 487; Smith v. Zalinski, 94 N. Y. 524; 37 Century Dig. Parties, § 99; Decen. Dig. Parties, § 63.

*V. R. Lovell* and *Engerud, Holt, & Frame,* for respondents.

This suit is on a promissory note given by Bruegger to the News Printing Company and by such company indorsed to Northern Trust Company. The latter could not claim to be a bona fide purchaser, because Hollister, who was the president and managing officer of the trust company, had full knowledge of the infirmity in the note, and the trust company was chargeable with Hollister's knowledge. Halloran v. Holmes, 13 N. D. 418, 101 N. W. 310; McCarty v. Kepreta, 24 N. D. 395, 48 L.R.A.(N.S.) 65, 139 N. W. 992, Ann. Cas. 1915A, 834.

The rule against impeaching a written agreement by oral evidence has no application, for the reason that the letter, exhibit "6," does not state what the agreed conditions were. 9 Cyc. 772; Ingram v. Dailey, 123 Iowa, 188, 98 N. W. 627; 9 Enc. Ev. 345, 346, 462.

All of those interested—the principals—in the newspaper held a meeting and agreed to launch the stock subscription enterprise, and agreed upon the general outlines of the plan. They delegated to a committee authority to arrange the details. This involved stating specifically what the plan was, the details of it, and manner of carrying it into effect. Therefore the statement of the plan of the meeting, prepared by this committee, is the best obtainable evidence of what the meeting resolved to do. Black v. Lamb, 12 N. J. Eq. 108; 1 Enc. Ev. 574; Pierce v. Roberts, 57 Conn. 31, 17 Atl. 278; Neely v. Naglee, 23 Cal. 152; Matzenbaugh v. People, 194 Ill. 108, 88 Am. St. Rep. 134, 62 N. E. 549; Copeland v. Boston Dairy Co. 184 Mass. 207, 68 N. E. 218; 16 Cyc. 1003; 1 Greenl. Ev. §§ 113 et seq.

We are not here dealing with a voidable contract, here the contract is valid and binding unless disaffirmed by the injured party promptly

upon discovering that it was brought into existence by fraud, duress, etc.

The delivery of an escrow contrary to the plain conditions of the escrow agreement is a void act, and such a wrongful delivery by the escrow holder gives no life to the instrument so wrongfully delivered. 16 Cyc. 579–582.

The escrow holder is the agent of the author of the escrow, as well as for the other party, for the special purpose of the escrow agreement. Mechanics' Nat. Bank v. Jones, 76 App. Div. 534, 78 N. Y. Supp. 800; Davis v. Clark, 58 Kan. 100, 48 Pac. 563; Shirley v. Ayres, 14 Ohio 308, 45 Am. Dec. 546; Lewis v. Prather, 14 Ky. L. Rep. 749, 21 S. W. 538; McDonald v. Huff, 77 Cal. 279, 19 Pac. 499; Gammon v. Bunnell, 22 Utah, 421, 64 Pac. 958.

In determining whether or not the author of the escrow (the principal) has ratified or affirmed the unauthorized act of the escrow holder, we must be guided by the same principles that apply in any other case of agency. It is unlike a transaction voidable for fraud, duress, etc., which is valid if not promptly disaffirmed. This case presents the very opposite condition. The unauthorized act is invalid, and remains so unless made good by ratification or estoppel. Rev. Codes 1905, § 5763, Comp. Laws 1913, § 6331; Morris v. Ewing, 8 N. D. 99, 76 N. W. 1047.

In this case, if there were ratification, it could only be by an implied agreement resulting from Bruegger's conduct, for no express agreement is claimed, and in order to imply such an agreement, it must clearly appear that Bruegger had knowledge that the conditions of the escrow agreement had been violated. 1 Mechem, Agency, 2d ed. § 438; Oxford Lake Line v. First Nat. Bank, 40 Fla. 349, 24 So. 483; Leonardson v. School Dist. 125 Mich. 209, 84 N. W. 63.

In the absence of an express or implied ratification by agreement, the unauthorized delivery of the escrow can be validated only by estoppel. Gjerstadengen v. Hartzell, 9 N. D. 268, 81 Am. St. Rep. 575, 83 N. W. 230; Eickelberg v. Soper, 1 S. D. 563, 47 N. W. 953; Sutton v. Consolidated Apex Min. Co. 15 S. D. 410, 89 N. W. 1020; 16 Cyc. 583–584, 722–747; Balfour v. Hopkins, 35 C. C. A. 445, 93 Fed. 564; Dixon v. Bristol Sav. Bank, 102 Ga. 461, 66 Am. St. Rep. 193, 31 S. E. 96; Everts v. Agnes, 6 Wis. 453; Cotton v. Gregory, 10

Neb. 125, 4 N. W. 485; Jackson v. Lynn, 94 Iowa, 151, 58 Am. St. Rep. 386, 62 N. W. 704; Quick v. Milligan, 108 Ind. 419, 58 Am. Rep. 49, 9 N. E. 392.

Silence, or inaction alone, is wholly insufficient to prove a ratification. There must be present other facts and circumstances justifying the inference that the silence or inaction was assent. Brown v. Henry, 172 Mass. 559, 52 N. E. 1073; Smith v. Fletcher, 75 Minn. 189, 77 N. W. 800.

The certificate issued to Bruegger was for preferred stock. It carried no voting power, and the holder of it had no voice in the management of the corporation. The certificate was in every sense a worthless piece of paper, and its retention was not the receiving and accepting and retaining of a benefit derived from the transaction, and did not constitute ratification. Boggs v. Wann, 58 Fed. 686; Manning v. Albee, 11 Allen, 520; Bishop v. Thompson, 196 Ill. 206, 63 N. E. 684; 1 Bigelow, Fr. pp. 424, 425.

The matter of argument of counsel to the jury is largely a matter of discretion resting in the trial court. Counsel has the right to draw logical inferences from the evidence so long as his comment is kept within the record.

In any event, comment on matters, even though they are not covered by the evidence, will not afford ground for reversal where the verdict is correct, and prejudice is not actually shown to have resulted. Chamberlain v. Lake Shore & M. S. R. Co. 122 Mich. 477, 81 N. W. 339; Chicago & A. R. Co. v. Pillsbury, 123 Ill. 9, 5 Am. St. Rep. 483, 14 N. E. 22; Miller v. Boone County, 95 Iowa, 5, 63 N. W. 353; Avery v. Burrall, 118 Mich. 672, 77 N. W. 272; Angle v. Bilby, 25 Neb. 595, 41 N. W. 397; Heater v. Penrod, 2 Neb. (Unof.) 711, 89 N. W. 762; Boltz v. Sullivan, 101 Wis. 608, 77 N. E. 870, 5 Am. Neg. Rep. 508; Kerlin v. Swart, 143 Mich. 228, 106 N. W. 710; Campbell Turnp. Road Co. v. Maxfield, 28 Ky. L. Rep. 1198, 91 S. W. 1135; Chicago & A. R. Co. v. Dillon, 123 Ill. 570, 5 Am. St. Rep. 559, 15 N. E. 181; Brusie v. Peck Bros. & Co. 42 N. Y. S. R. 801, 16 N. Y. Supp. 648.

The plaintiff, the Northern Trust Company, was not a bona fide holder of the note, because Hollister, the president and manager of such company, knew of all the facts and of the infirmity in the note,

and his knowledge is imputed to his company, for which he was acting in such transaction. Emerado Farmers' Elevator Co. v. Farmers' Bank, 20 N. D. 270, 29 L.R.A.(N.S.) 567, 127 N. W. 522; First Nat. Bank v. Blake, 60 Fed. 78; Ditty v. Dominion Nat. Bank, 22 C. C. A. 376, 43 U. S. App. 613, 75 Fed. 769; Le Duc v. Moore, 111 N. C. 516, 15 S. E. 888; Brobston v. Penniman, 97 Ga. 527, 25 S. E. 350; Holden v. New York & E. Bank, 72 N. Y. 286; Cook v. American Tubing & Webbing Co. 28 R. I. 41, 9 L.R.A.(N.S.) 193, 65 Atl. 641; Smith v. Wilson & B. Sav. Bank, 1 Tex. Civ. App. 115, 20 S. W. 1119; Lowndes v. City Nat. Bank, 82 Conn. 8, 22 L.R.A.(N.S.) 408, 72 Atl. 150; First Nat. Bank v. New Milford, 36 Conn. 93; Citizens' Sav. Bank v. Walden, 21 Ky. L. Rep. 739, 52 S. W. 953; Fishkill Sav. Inst. v. National Bank, 80 N. Y. 162, 36 Am. Rep. 595; Loring v. Brodie, 134 Mass. 453; National Bank v. Feeney, 9 S. D. 550, 46 L.R.A. 732, 70 N. W. 874; Oak Grove & S. V. Cattle Co. v. Foster, 7 N. M. 650, 41 Pac. 522; City Nat. Bank v. Martin, 70 Tex. 643, 8 Am. St. Rep. 632, 8 S. W. 507; Traders' Nat. Bank v. Smith, — Tex. Civ. App. —, 22 S. W. 1056; Union Bank v. Wando Min. & Mfg. Co. 17 S. C. 339; National Bank v. Munger, 36 C. C. A. 659, 95 Fed. 87; Hobbs v. Boatright, 195 Mo. 693, 5 L.R.A.(N.S.) 906, 113 Am. St. Rep. 709, 93 S. W. 934; Niblack v. Cosler, 74 Fed. 1000, 26 C. C. A. 16, 47 U. S. App. 637, 80 Fed. 596.

Goss, J. This action is brought on a promissory note for $5,000, dated May 23rd, 1910, to the News Printing Company by John Bruegger, maker, and due December 1, 1910, and owned by the Northern Trust Company. The sole defense submitted to the jury was that the maker had deposited the note in escrow under an escrow agreement subsequently not complied with, and under which it was not to be delivered to the payee until at least $45,000 more had been raised by sale of corporate stock of the News Printing Company, payee. That plaintiff purchased the note after its maturity; other defenses of fraud, misrepresentation, and concealment on Hollister's part to Bruegger, and damages to defendant maker to the amount of the note because of its attempted delivery in violation of said escrow agreement, are pleaded, but abandoned on trial. At the close of the case the question submitted was that of nondelivery, raising issues of fact of (1) whether

the note was delivered by Bruegger to Hollister under any escrow agreement at all; and, (2) if so, what were the terms thereof? (3) if delivered under an escrow agreement, whether the terms of that agreement were violated by Hollister; (4) whether Bruegger has waived or estopped himself to assert an escrow delivery as a defense. Assignments raise alleged error in rulings and on instructions and also the sufficiency of the proof to sustain the verdict in Bruegger's favor.

A brief résumé is necessary of circumstances attending upon the delivery of the note. In 1910 the News Printing Company was incorporated by Hollister and Democratic associates, F. O. Hellstrom and J. C. McAndress, looking toward the securing and controlling of the Fargo Daily News as a Democratic organ in the coming campaign. Bruegger was a Democratic candidate for nomination as United States Senator at the primaries in June, 1910, and was nominated. In 1908 he had indorsed a note for $1,000 used toward financing said newspaper. But that note was returned to him upon his signing along with thirty-six other prominent Democrats of a written guaranty of payment of notes of the News Printing Company to the Northern Trust Company. This was done through Hollister as active officer of and for the Northern Trust Company, its president in 1910. He was also the managing officer of the News Printing Company and of the Northern Savings Bank, intervening holder of this note in suit and subsequently chartered in 1911. The mortgage to the Northern Trust Company, thus guaranteed, fell due in March, 1910. A second mortgage for $10,000 and interest aggregating over $12,000 to a trustee for the Merchants National Bank was also past due, with foreclosure threatened. Other debts were owing. In December, 1909, arrangements had been made for a $50,000 issue of trust bonds to meet these mortgages, but it was not consummated except that T. F. Marshall, Jas. Buchanan, A. J. Gronna, Amasa Peake, and other "insurgent" Republicans had subscribed for the purchase of $35,000 worth of this $50,000 bond issue, and in January, 1910, paid in $12,000, to be used in redeeming the newspaper from the contemplated foreclosure of the $10,000 second mortgage. This sum, together with about $300 furnished by the newspaper, had been used for said purpose two months prior to the date of this note; the paper was purchased under the foreclosure sale, with title taken to Hollister, Hellstrom, and McAndress. They immediately

resold it to the News Printing Company, recently organized as a holding company, for an alleged consideration of $50,000 of the stock of that company, of which they were the incorporators.

In March, 1910, Hollister and McAndress entered into a contract with D. H. McArthur, chairman of the Democratic state central committee, under which McArthur was to dictate the future political policy of the newspaper. Then, evidently realizing that, should the bonds subscribed for by the insurgent Republicans as subscribers be taken by them, the political policy of the paper would be under Republican instead of Democratic control, Hollister, McArthur, and others arranged for a meeting at Grand Forks on May 20, 1910, of many of the leading Democrats of the state. The meeting was held. There were present Bruegger, Joseph Kelly, W. L. Richards, Hollister, McArthur, and others. It might be mentioned that as a circumstance to stimulate interest in the meeting and in its attendance notice had been given by the Northern Trust Company of the protest and nonpayment of the $30,000 first mortgage on the Fargo news plant, and notice that each of the thirty-seven subscribers to the indemnity bond as additional security to the mortgage would be asked to respond for the $1,000 guaranty of each as subscribed.

As to the purposes of and events at the meeting, McArthur testifies: "The meeting was arranged by Hollister, myself, and McAndress. It was a meeting of the representative Democrats from different parts of the state. They were called together for the purpose of trying to raise sufficient money to take over the Fargo Daily News and make a Democratic paper of it. Hollister made a statement at that meeting with regard to the financial condition of the paper at the time, and I think he estimated it was necessary to have about $50,000 to buy up the bonds and carry the floating indebtedness, and I think there was also some talk of a fund for a working fund, but am not sure as to the amount that was talked of that night. It was estimated there would be $50,000 necessary to raise. They canvassed the situation that night among the boys that were there to see about how much they thought they could raise from the different districts they represented. And I think Bruegger went on record that night for $5,000, as he thought he could raise that much up in that western part of the state, including Williams, Ward, and Burke counties. In all I think there was about

$35,000 in sight that night. They canvassed the situation, and Kelly and myself were appointed a committee to kind of focus this matter and to see what could be done toward raising the balance. So we went West on the train,—Bruegger, Kelly, and myself. We continued the discussion of the proposition on the train. Kelly was very positive with regard to the full amount,—with regard to raising the full amount before anyone should pay over any money. After he got off at Devils Lake, Bruegger and myself continued the conversation, and I told him that the great difficulty in soliciting funds of this kind was to get a starting point somewhere; that when you went to an individual to solicit a sale of stock, the usual question would be: 'Who is taking stock?' 'Who is in on this?' and on account of that condition of affairs I said it was uphill work unless some one would condescend to give it a start so that when you went to the next man you could say 'John Brown or John Smith gave me so much, gave his note for so much;' and in that connection Bruegger stated that he didn't mind giving his note for the amount which he thought he could raise in his district,—provided they would be in good faith with him, providing the note would be held until the full amount was raised to make this a Democratic paper. So I assured him from my knowledge, from my acquaintance with McAndress and Hollister, that I thought they would be in good faith and that he would be perfectly safe in putting the note up on those conditions, and that it would help us out greatly in soliciting other sales of stock. And I called Hollister's attention to it over the phone that night, and said I thought that if Bruegger was given to understand his note wouldn't be used until the full amount was raised sufficient to put the newspaper in the clear and make a Democratic paper of it, he wouldn't mind putting up his note for $5,000 as a starter. That is as it was."

Q. State what, if anything further, was said by you to Bruegger at or about that time with regard to his note not being cashed until at least $50,000 had been raised.

A. That was the sum,—at least have to be $50,000.

Joseph M. Kelly testifies to the understanding of the purpose and result of the Grand Forks meeting to be substantially as McArthur has related, and that it was deemed necessary to raise $50,000 by sale

35 N. D.—11.

of corporate stock to put the newspaper on its feet, pay its mortgages and floating indebtedness, and that he and McArthur were appointed a committee to "go ahead and get these subscriptions," and that accordingly, on May 30, 1910, he issued over his own signature a general circular soliciting subscriptions in which the indebtedness of the paper is set forth as—

about $50,000, and as the present owners of the News Printing Company feel that this is too heavy a load for them to carry alone, they ask that the Democrats of the state assist in carrying part of this load, and that they are willing to resign to them the entire management of the property. The plan that this committee has formulated is as follows: That subscription lists be sent to representative Democrats in different parts of the state, and that they be asked to circulate them in their districts. We inclose you such subscription list, and ask that you solicit your subscriptions from those most able to pay them. Subscribers will have the privilege of selecting either common or preferred stock of the News Printing Company. The preferred is entitled to the first earnings up to 6 per cent, and the common stock will be entitled to the management and any earnings over 6 per cent paid to the preferred. The present owners of the News have agreed to retain $15,000 of the common stock so that $35,000 more subscription will be sufficient. In the event that subscribers should not have funds convenient for payment, notes will be taken in payment for one year. It is unnecessary for us to dwell on the necessity of our having an organ with a state-wide circulation in order to more properly place our principles before the voters of the state. Aside from that, we believe that from now on, the plant will pay good dividends. . . . I will be glad if you would advise me what you can do in your district at an early date. Unless the full amount of $50,000 is subscribed, we do not propose to go any further into it, as we would not deem it advisable to invest in the property unless we could absolutely control it. Yours truly,

(Signed)        Jos. M. Kelly.

It is shown that this circular was sent to leading Democrats of the state. Some subscriptions were obtained. Kelly testified to having procured $10,000 worth, but that he did not deliver them to Hollister because "we didn't have enough" to make up the $50,000.

W. L. Richards, of Dickinson, testified he was present at said meeting, the object of which "was to finance this newspaper for the benefit of the Democratic party in the state;" that Hollister was present and explained the financial condition of the newspaper, stated of what its assets consisted, and "made the proposition that if we could raise $75,000, that would pay off the indebtedness and give the paper a working capital of $25,000 or about that."

Q. State whether or not the method proposed by Hollister for raising this money was by sale of the stock of the News Printing Company.

A. That is my remembrance of it.

Q. What, if anything, was said by Hollister with regard to the condition, if any, on which those subscriptions should be payable or should not be payable?

A. That unless this amount was paid none of us was bound on our obligation to take this stock.

Q. That the subscriptions would not be binding unless the full amount was paid in as you have stated?

A. Yes.

That a committee was appointed of McArthur and Kelly to carry out the program. That witness was solicited to purchase stock and paid $500 cash for that amount of stock, sometime after the first of July, 1910.

Bruegger testifies he was present at that meeting with ten or twelve other prominent Democrats, among them McArthur, Hollister, McAndress, and F. O. Hellstrom; that "the proposition on behalf of the News Printing Company was submitted by Mr. Hollister; . . . that the effort to raise at least $50,000 was to be made in order to cover all of the indebtedness of the plant so that the Democrats would get absolute control of the paper and conduct the policy thereof; . . . the matter of raising the money was left to the individuals largely to see what sums they could raise in their districts; and at the close a committee was appointed that should have the authority to solicit subscriptions for that purpose."

Q. Subscriptions to what?

A. Subscriptions for to raise not less than $50,000 in order to get the control of the newspaper.

Q. What were they going to be solicited to subscribe for?

A. For stock in the paper, in the News Printing Company.

Q. Now was any other method than by selling of stock proposed by Hollister or any individual representing him at that meeting?

A. In my recollection I would say not.

Q. Did you make any subscription at that meeting?

A. I don't think that I signed for anything, but I promised that I would raise in what was considered my territory $5,000.

Q. You told the meeting you could get subscriptions for that amount you thought?

A. Yes.

Q. Now was anything said in the meeting about when these subscriptions would be payable; on what condition; if so tell what the substance of that condition was?

A. The substance was-that nobody was to pay up any of the money for the subscriptions until the full amount had been raised.

Defendant then testifies that McArthur and Kelly were appointed a committee to push matters. They went West together toward their homes discussing the project.

Q. Now what did McArthur say to you with regard to a subscription, a conditional subscription to stock, if anything?

A. He explained the difficult feature that confronted him to start the subscription—to do anything with the subscription—was to get a start, and a good many people would be willing to help the movement along if it was shown that a start had been made. He went over the situation with me in reference to what he considered I could raise in this territory that had been allotted to me, and he suggested that if I would put up the note for $5,000 that I had agreed that I would raise in this territory, it would help him in his work. He says that the note, if sent down to Hollister, would not be used until the whole sum being sought after had been raised, and that would give him the assistance he needed to get out and make the start. The whole amount to be raised was $50,000.

Q. State what, if anything, he said to you with regard to how it was to be raised,—by the sale of what?

A. By the sale of the common and preferred stock of the News Printing Company.

Witness then reavers that "the understanding was unless the $50,000 was raised the note would not be used." This Grand Forks meeting was held on the evening of May 20th, 1910.

On May 23rd, 1910, according to the corporate records of the News Printing Company, the following "waiver of notice of special meeting" was entered into:

We, the undersigned, representing and being the stockholders and owners of all of the capital stock of the News Printing Company, which has been sold, issued, and is outstanding at the date hereof (no preferred stock having been issued or is outstanding at the date hereof), do hereby consent that a special meeting of said corporation may be held at its office in the city of Fargo, North Dakota, on the 28th day of May, 1910, for the purpose of submitting to a vote of the stockholders the proposition of increasing the preferred stock of said corporation from $50,000 to $100,000, and by amending §§ 1 and 2 of art. VII. of the by-laws in reference to said preferred stock, and when and upon what notice the same may be retired; and we do each hereby specially waive all the requirements of law as to the publication and service of the notice of such meeting.

Dated, Fargo, North Dakota, May 23d, 1910.

(Signed) Geo. H. Hollister.<br>
J. C. McAndress.<br>
F. O. Hellstrom.

The corporate records disclose that said special meeting was held May 26, 1910, at which time by resolution of these three stockholders and "owners of all the capital stock of the News Printing Company, which has been sold, issued, and is outstanding," "the preferred capital stock of said News Printing Company be and the same is hereby increased from the sum of $50,000 to the sum of $100,000." The same resolution recites that "to date none of the preferred stock of the News Printing Company has been sold, issued, or is outstanding," and also limits the common stock issue to $50,000, all of which had been issued in equal parts to Hollister, Hellstrom, and McAndress. Concerning this authorized increase of stock issue, Hollister testifies the reason for it was that "it was the object to have plenty of preferred stock for all that wanted to buy," and that this increase was

authorized May 26, 1910. It is obvious that it was one of the results of the Grand Forks conference, and was taken as a step toward the execution of the purpose for which Hollister, McAndress, McArthur, and others called and held that meeting.

Under these conditions in the finances of this newspaper, and with the necessity confronting its management of raising a large amount of money to meet its obligations to keep its political support; the Grand Forks meeting of leading Democrats called to considered these questions with Hollister and associates present and explaining the financial side of the matter and necessarily familiar with what was done; the appointment of a committee and its work at soliciting funds; the preparation by Hollister and his associates to deliver any amount of preferred stock the committee might sell up to $100,000; that the raising of $75,000 in that manner had been considered possible and desirable; the proximity of the coming primary election only a month away, rendering it advisable that the control of the paper be taken from the insurgent Republicans who had subscribed for $35,000, and already taken and paid for $12,000 of the $50,000 bond issue authorized in the January, 1910; that the second mortgage had been foreclosed and the ownership of the plant and the responsibility and liability that accompanied ownership was in the News Printing Company, the *alter ego* of Hollister, Hellstrom, and McAndress, and with $12,000 invested of the money subscribed by the insurgent Republicans of the $50,000 bond issue to take up said second mortgage; the $30,000 outstanding first mortgage overdue since March 1st, and not paid,— all this taken in connection with the testimony above narrated that at least $50,000 should be raised by the sale of corporate stock of the News Printing Company, or the project to place the paper upon a sound financial basis and under Democratic control be entirely abandoned, reflects the proof of the facts, circumstances, and conditions under which defendant Bruegger asserts Hollister induced him to sign and deliver the note in question and under which and in the light of which he construed the letters received by him from Hollister or the Northern Trust Company by Hollister, and his answer thereto and his subsequent course of conduct until in December, 1910, when he disclaimed his liability on the note in suit. All this, together with McArthur's testimony that he informed Hollister of the circumstances

under which Bruegger had consented to start the subscription out with his $5,000 note, is introductory to such correspondence now set forth. Under date. of May 9, 1910, Hollister had written Bruegger as follows: "D. H. McArthur has stated to me that he had made arrangements with you for you taking an interest in the News Printing Company to the extent of $1,000 at this time. . . . Am in hopes of getting this matter rounded up so that a half dozen can have, say, $5,000 apiece, and control it. We have one of two others who are agreeable provided we can make the proper combination. . . . I hope to have matters in shape so that you can come in here and meet with the others in prospect and come to a final understanding and decision." Eleven days later the Grand Forks conference was held, and the plan to raise the money by the sale of stock was determined upon; McArthur, Kelly, and Bruegger had had the understanding, and McArthur had communicated it by phone to Hollister. Then by letter of May 23, 1910, upon Northern Trust Company letterhead, the. following letter was received by Bruegger from Hollister. It is the letter under which the note in question was signed and transmitted, it reads:

"Mr. McArthur has communicated to me by telephone the substance of the conversation between you, Mr. Kelly, and himself, and stated that you would be guided by my judgment, or words to that effect. I hardly like this way of putting it up to me, but I do not know as I can blame you. We are working on the proposition and with good success, and are sure that the turn can be made and the money raised, but of course there is a chance of its not going through, and, really, the only fair way of doing this is to have the subscriptions held until there are enough in to turn the deal before using any of it, and that is the system we are adopting.

"With this understanding, I am inclosing herewith note for the amount agreed by you and if you will sign this and return to me, it will not be used until the deal is turned and money raised to put the paper in the clear.

"When this note comes due, this company will be glad to loan you at least half of it if you so desire, in renewal, and this note will probably be indorsed over to this company in the meantime so we will undoubtedly own it at maturity."

To this letter Bruegger replied May 27, 1910, as follows:

Your recent favor to hand and I inclose herewith the note you submitted with my signature attached; of course I confess that although, my heart and soul is in the movement, although I think all men of the party should help carry the burden, and although I do not want to shirk my part, I do not like to sign this $5,000 obligation at present, it may be if my dreams are realized it will not be hard to meet the obligation, but there are so many possibilities to be considered that I feel in submitting this to you I am not following clearly along the lines a man should seek for his continued safety but an occasional plunge may be justified in life, however I would feel much better if I was sure we would have a crop here this year and that my coal mine was operating at a profit and this would only be a joke. In any case I ask for your consideration and co-operation in taking care of this.

(Signed) John Bruegger.

Hollister acknowledged receipt as follows:

I acknowledge receipt of yours of the 27th with contents as stated. I realize the force of all you say more than you imagine. I have been carrying the big end of this burden for two years, and have felt sure that eventually, when the different Democrats of the state would fully understand the facts, I would get relief.

It will probably take a week to get everything lined up so that we know that the newspaper is in the clear, at which time the stock will be issued, and I really believe you will never regret this act.

(Signed) Geo. H. Hollister.

The following letter dated July 19, 1910, was on that date mailed to Bruegger. It contained a certificate of fifty shares of the par value of $100 each, filled in to John Bruegger, signed by Hollister as President and McAndress as Secretary of the News Printing Company, bearing date of issue as May 30, 1910. This letter reads:

I inclose you herewith certificate for fifty shares of the preferred stock of the News Printing Company, paid by your note some time ago. This has dragged along some time waiting for others to come along. I wish that everyone was as prompt with their fulfilment of

promises as you are.   Some of these fellows are long on promises and mighty short on fulfilments.

(Signed) Geo. H. Hollister.

On August 9th Bruegger writes Hollister asking assistance for some newspaper at Rugby to which Hollister replied that "I presume that during the next sixty days I could arrange for the loan referred to, provided the security was sufficient.   However, our people would demand personal endorsement sufficient to take care of the obligation regardless of the security which the Rugby people could pledge." This Rugby letter is of little importance, but is inserted to complete the correspondence.   On August 17, 1910, unsolicited except by the foregoing events, Bruegger received the following letter from Hollister:

I am pleased to advise you that I have made a turn in the newspaper that bids fair to protect everybody interested.   Mr. McArthur found responsible parties to take over the business management and put in capital stock enough, with what we had, to put the proposition in fairly good shape, and I hasten to write you that you may not be worrying unduly over your part in the transaction.

I understand, at least for the present, Mr. McArthur will be in control of the policy, and I know that your particular interests will not suffer.   Our mutual friend Kelly has had another spasm of talking big and meaning and doing nothing, but as he has done so many times before, flattered himself that he was fooling us all, but with what object, I am unable to fathom.   I am quite well satisfied with the present situation and believe that the business will go on and prosper.

(Signed) Geo. H. Hollister.

Bruegger replied as follows:

'August 23rd, 1910.

Yours of the 17th inst. duly received.   Replying to same wish to state that I fully appreciate the contents of your letter and feel grateful to you, as the times this year are not intended to encourage a man much (especially in this locality where a community is not yet fully established) to any great new ventures.

I hope things will be pleasant and agreeable in the organization, and that Mr. McArthur will meet with deserving success. He certainly has my best wishes, and I want to assure you that I will at all times be ready to back him up to the best of my ability, in all things that he might venture in.

Once more I wish to thank you for the course that is being pursued, and with best wishes, I remain

Yours very truly,<br>(Signed) John Bruegger.

Shortly after November 18, 1910, Bruegger received written notice from the Northern Trust Company that his note for $5,000, aggregating with interest $5182.25, would be due on December 1st, 1910. To this Bruegger replied by letter under date of Nov. 21st, as follows:

Notice of due date for note having been mailed me, as Dec. 1st, I write to ascertain if it will be possible for you to accept my offer; viz., to pay you $500 and return the bond for the surrender of my note. I assure you I would feel greatly relieved should you be able to favor me to this extent. If not I would like to renew as follows: $1,000 Feb. 1st, 11, and $4,000 1 year. After going through a hard and expensive compaign it will worry me to make any payment on this note at this time.

(Signed) John Bruegger.

Hollister then inclosed Bruegger blank notes for renewal, with the following letter:

November 26, 1910.

We are in receipt of yours of the 21st.; in reply will say that, as I have always told you, this claim can be paid almost at your pleasure; we do not care to take the position of forcing it, knowing that you will do all that you can at all times. I inclose you herewith notes in renewal,—one for $1,000, due February 1st, and the other for $4,000, due in one year. If you will sign these and return to us with a check for the interest, the matter can run along.

In the meantime, I will watch every chance to spread this liability over others, but as it stands now, both Hellstrom and McAndress are

attempting to shoulder all the loss at this end on me. Whether they succeed or not can only be told by the courts, but should there be any chance, you may depend upon it I will relieve you to the extent of my ability.

(Signed) Geo. H. Hollister.

Twice during the summer Bruegger had been in Fargo and had discussed the newspaper venture with Hollister in a general way, but not going into details. He says that he did not learn how Hollister had, to quote his words, "made the turn in the newspaper." Hollister, on the contrary, claims that he explained the situation fully to Bruegger, who assented thereto.

The newspaper's financial difficulties were handled by Hollister. $2700 in notes and cash over Bruegger's note, making $7,700 in all, had come into Hollister's possession as a result of the Grand Forks meeting. One of these was a note of $500 given by John Carmody, mentioned because error is predicated upon the admission of proof that the same had been sued upon, and is referred to later. Kelly's subscriptions of over $10,000 was not turned over to Hollister, and hence not involved with the $7,700 in notes and paper indorsed to the News Printing Company. The balance of the $50,000 issue of bonds over the $12,000 paid in January was taken by the Northern Trust Company in July, 1910. Thus the note to Bruegger, claimed by him to have been given as a subscription, to be delivered only upon condition that $50,000 was realized from sales of stock of the News Printing Company, was not held to await such a condition never happening, but instead was applied as a campaign contribution upon the debts of the News Printing Company to the Northern Trust Company. Hollister, as president of the News Printing Company, indorsed Bruegger's note by a general indorsement and delivered it to the Northern Trust Company, who indorsed it without recourse to the Northern Savings Bank. It instituted this action against Bruegger, who answered, denying liability on the note. It reindorsed the note back to the Trust Company, who then was substituted as plaintiff in lieu of the Northern State Bank, dismissed from the suit, and this action continued under the present amended pleadings against both Bruegger and the News Printing Company, defendants.

·· In August, 1910, a sale was made of this newspaper to one Colwell, a friend of McArthur. Transfer was made of the News Printing Company's stock by the three holders of it to Colwell. This was the "turn in the newspaper" referred to by Hollister in his letter to Bruegger of August 17. The newspaper lost money steadily and heavily. On October 31, 1910, suit was commenced to foreclose the $50,000 bond issue only recently sold in July. The default was in failure of the new owner to keep the property insured and pay the Associated Press franchise fee. Kelly, on behalf of the Democrats, answered in this foreclosure, and in order to keep the control of the newspaper until after the November election agreed to pay all expenses of running the paper, and that judgment might be entered on the foreclosure after the election. Judgment was entered accordingly November 15, 1910, and on November 26, the property sold on foreclosure was bid in for the bondholders, the principal one of which was the Northern Trust Company.

Bruegger testifies he was in ignorance of the details and facts concerning the foreclosure, but heard of it incidentally soon after election, but supposed his liability on his note would be taken care of, believing that other subscriptions to the amount of $50,000 had been taken and used by Hollister in swinging the deal, and that accordingly he would "get some credit upon his note" from the proceeds of that sale. Bruegger says that prior to that time he had made an appointment with Hollister to go over the financial condition of the newspaper and plant with him, but that Hollister failed to keep his appointment, and Bruegger returned home. So instead of answering Hollister's letter of November 26, 1910, inclosing blank renewal notes, Bruegger delayed further action until he could meet Hollister at a Democratic banquet that was to be held in December. He saw Hollister, though of this he testifies: "I asked about how much credit that I should get on my note from the proceeds of the foreclosure, and he told me there would be none. I wanted an explanation. He stated that the proceeds of the mortgage foreclosure went to the bonds, in which I was not interested. That I had preferred stock, and both the preferred and common stock wouldn't realize anything out of this sale. I then looked up to him and said to him that 'this is the rawest deal I ever run up against.' He stated or asked, 'I hope this won't make

any difference in our friendship,' to which I replied, 'That remains to be seen,' and went out of the office." He further testifies: "I offered $500 and to surrender the stock and take my note" sometime in August after the receipt of Hollister's letter of August 17th, stating he had made a turn in newspaper "that bids fair to protect everybody's interests." But Hollister refused that offer. This is Bruegger's explanation of why he renewed such offer in his letter of November 21st.

The foregoing facts present Bruegger's side of the controversy. Hollister denies any knowledge of Kelly's circular letter or that the committee appointed at the meeting was to solicit subscriptions, or that any notes taken should be retained until $50,000 or any particular amount of subscriptions should be taken; and claims that by using the notes and subscriptions to turn the newspaper deal as he did by having the Trust Company and the others take the bonds and pay the balance of the indebtedness owing by the newspaper and releasing the thirty guarantors of the prior bonds, and their surrender on the acceptance of the last issue, and by turning the plant over to Colwell, he, Hollister, had performed his part of the engagement as he had understood it. He claims the correspondence alone establishes that to have been the understanding under which the note was delivered, and that it was error to receive in evidence what was said and done by Kelly and McArthur to Bruegger. He also denies the substance of McArthur's testimony as to the phone conversation. All the testimony of Bruegger, Richards, and Kelly as to their understanding of what was done at the Grand Forks meeting was received under objections as to its admissibility for any purpose.

Questions of law involved will now be discussed. The theory of Bruegger's defense under his proof was that there never had been delivery by the escrow holder, Hollister, of Bruegger's note delivered in escrow to him, and that the note never had been delivered because the conditions precedent to its delivery, *i. e.*, the sale of an additional $45,000 worth of stock besides that taken by Bruegger, had never been brought about, and that the note in legal effect had never been delivered, and was void *ab initio*. The plaintiff denied that a delivery in escrow had been contracted for or was understood, and alleged that the note had been delivered to Hollister unconditionally and had been transferred to plaintiff for value in due course and without notice

of any defenses; that though it should be found that the note had been delivered in escrow, yet defendant had been informed of its use and knew that it had been used, and had acquiesced and consented therein, and was estopped by his acts and conduct to assert nondelivery as a defense. Defendant has denied knowledge of such facts asserted to have been known by him, and alleged a wilful concealment by Hollister from him as inducing any nonaction and seeming acquiescence.

Each party had the right to make proof along the line of the claims asserted in the pleadings and on the trial. Examination of the letters transmitting the note for signature and returning it signed discloses reference to prior negotiations had between McArthur, Kelly, Bruegger, and Hollister, and that representations had been made by McArthur to Hollister of "the substance of the conversation between you (Bruegger), Kelly, and himself (McArthur)," and that McArthur had communicated that conversation to Hollister by phone. Also that there was a "proposition they were working on" and a "turn" to be made and to be "money raised" for "subscriptions" to be obtained and "held" "until there are enough in to turn the deal before using any of it, and that is the system we are adopting." This is ample to constitute a foundation upon which the parties therein mentioned should be permitted to testify in explanation of the matters referred to in said letter. In fact, under the assurance contained in the letter that the note "will not be used until the deal is turned and money raised to put the paper in the clear," coupled with the reference to the agreement or understanding between McArthur and these people, all the testimony offered on that subject was admissible. Under no circumstances could it be claimed that the letter constituted the entire contract under which the note was executed and transmitted. The letter conclusively refutes that contention. In fact, without other evidence it is impossible to tell what the proposition or deal to be turned was or the amount of subscription or to what or how it was to be applied or the amount of money to be raised necessary to put the paper in the clear. And Bruegger's reply is equally blind unless read in the light of the prior events disclosed by the proof. When so considered it is understandable. His statement that "I think all men of the party should help carry the burden, and although I do not want to shirk my part I do not like to sign this $5,000 obligation at present. It

may be if my dreams are realized it will not be hard to meet the obligation, but there are so many possibilities to be considered that I feel in submitting this to you I am not following clearly along the lines a man should seek for his continued safety. But an occasional plunge may be justified in life. . . . I ask for your consideration and co-operation in taking care of this,"—showed he had misgivings and felt that there was some risk, some liability, but intrusted the note to Hollister to start the subscription off.

Testimony explanatory of these letters was properly admissible and is ample to sustain a finding of a delivery in escrow. And the jury must have so found before the verdict for the defendant under the instructions could have been returned. That the note was delivered in escrow and upon said condition as to second delivery must be taken as established by the verdict. Hence Bruegger should prevail under such defense, unless the jury were warranted in finding that he was estopped from asserting it. If this defense was properly submitted, the findings thereon are conclusive upon controverted *fact*. And the only facts in dispute concern the knowledge of Bruegger of the use made of his note and of whether he knew that $50,000 of subscriptions for capital stock had not been realized, and, knowing these facts, either had released the condition and authorized the use of his note, or by his nonaction when he should have acted is estopped to assert his defense because the other party had meanwhile, and in reliance upon his conduct and consent to the use of the note, changed its position to its disadvantage, prejudice, or injury, so that to allow the defense of nondelivery would operate as a fraud upon it.

An examination of the correspondence subsequent to the delivery of the note and up to and including Bruegger's letter of November 21st containing the offer to renew this $5,000 obligation contains nothing which in itself can be held as a matter of law to constitute an estoppel against Bruegger. Any possible estoppel arising from such correspondence must be predicated upon Bruegger's last letter. It may be assumed that such letter would constitute an estoppel against him had it been written with full knowledge of everything transpiring previously thereto. But the jury have found that Bruegger did not have such knowledge, as under the instructions to have found for him it must have found that Hollister had concealed from Bruegger

"the fact that sufficient of the stock of the News Printing Company had not been sold to take up all the outstanding obligations existing at the time Bruegger's note was transferred to the Northern Trust Company," quoting from instructions on this point.

This finding of ignorance by Bruegger of true conditions must be adopted as it must have been so found, otherwise under the instructions the jury could not have found for Bruegger. And once Bruegger's ignorance of the facts are conceded, it is also established thereby that the condition attached to the escrow agreement has neither been waived nor released, as the same could only have been done with full knowledge of the facts to be binding upon Bruegger.

That the trust company is the owner of the note does not change the situation. Hollister was its president, and the very letter of May 25, 1910, soliciting Bruegger's signature to the note, is that of the Northern Trust Company, by "Geo. Hollister, President." No other construction can be given than that the plaintiff is the *"we"* mentioned in *"we"* are working on the proposition, . . . and that is the system we are adopting. . . . We are making arrangements for a systematic sale. of the stock, . . . and *we* believe *we* can sell stock enough to get along without any bonds at all. . . . This company will be glad to loan you at least one half of it if you so desire in renewal, for this note will probably be indorsed over to this company in the meantime, so *we* will undoubtedly own it at maturity, . . . and that is the system *we* are adopting." In any event full notice and knowledge of all defenses are imputable. to the Trust Company from the knowledge and acts of its president in the premises. McCarty v. Kepreta, 24 N. D. 395, 48 L.R.A.(N.S.) 65, 139 N. W. 992, Ann. Cas. 1915A 834; Grant County State Bank v. North West Land Co. 28 N. D. 479, 150 N. W. 736. Every defense available against the News Printing Company can be asserted against plaintiff.

Delivery in escrow, however, was made to Hollister, not to plaintiff. Hollister was the person McArthur arranged Bruegger should deposit his note with, and Bruegger did so. Consult his letter to Hollister transmitting his note. Plaintiff company was unknown to McArthur in this deal.

Numerous objections were taken on the trial to evidence offered

tending to show that at the time Bruegger's note was used and at all times thereafter the stock was worthless, and that the newspaper, operated at a loss, did not increase its assets. All this as proof tended to establish the defense and counterclaim based on the wrongful delivery of the note, and that the fraudulent concealment of facts by Hollister from Bruegger damaged him to the full sum due on the note. At the time this kind of proof was offered it bore upon an issue presented by the pleadings and was admissible.

At the close of defendant's main case plaintiff's counsel moved that Bruegger be required to state "upon which theory they were proceeding in this case, whether upon the theory of rescission or affirmance of the contract." Thereupon Attorney Engerud stated that no question of rescission was involved, but, instead, the defense was whether the note was delivered in escrow, and if so, whether such defense could be asserted, and that no rescission was claimed. The statement was correct. The error assigned upon the denial of a motion for an election of defenses is not well taken.

Error is assigned, but not argued, upon the proof offered and received concerning the Carmody note and another for $200. This assignment is abandoned, and not argued in the brief. But in any event it is apparent that the testimony bore upon the issues as disclosing whether the plan of selling stock was being carried out. Likewise the corporate books and the circular letter offered and received were admissible for the same reasons. Nor did the court err in requiring a new answer from defendant after it had allowed substitution of the trust company as plaintiff, in lieu of the Northern Savings Bank, instituting this action.

Counsel for defendant in the course of argument to the jury made a statement in effect that the reason why the News Printing Company had been joined as a codefendant with Bruegger was to get the latter "down into this part of the state where he is comparatively little known," or where he "wasn't so well and favorably known as among his neighbors and acquaintances there in Williams county where he lives." To the objection taken the trial court stated that "in overruling the objection the court states in the presence of the jury that the plaintiff had a legal right to make the News Printing Company a party defendant in this action, argumentatively however, counsel

35 N. D.—12.

for defendant can proceed." The argument made was of doubtful propriety, and the court should have sustained the objection and cut off argument of that kind under the facts disclosed by the record. However, it was not prejudicial error warranting granting of a new trial.

Error is assigned upon instructions given and refused. There is no prejudicial error upon that score. The only exception argued to instructions given is that "the court did not in any manner instruct the jury on the measure of damages applicable in this case, and failed to in any manner instruct the jury on the question of rescission or affirmance of the transaction." The instructions in the main were correct and unchallenged. After defining the issues, the court started to instruct upon the question of damages arising from concealment, evidently confusing the issues proper to be submitted under the proof at the close of the case with those tendered by the pleadings. As no issue of damages was involved, there was no error in failing to instruct upon a defense abandoned. Defendant relied instead upon the sole defense of breach of the escrow agreement. No question of affirmance or rescission was involved.

Error is predicated upon refusal to instruct as requested that "a contract which is voidable solely for want of due consent may be ratified by a subsequent consent." This had no place in the instructions. It was beyond the scope of the proof. It would have been confusing when injected into a consideration of whether there was an escrow agreement, and if so whether it was complied with or compliance waived. The escrow agreement was a contract. No question arose as to its voidability. It was valid if it was made. Estoppel to claim it is a different matter entirely.

Error is assigned and argued upon failure to instruct as requested "that a voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known or ought to be known to the person accepting" (Comp. Laws 1913, § 5866), and counsel argues that Bruegger had constructive knowledge, i. e., he had the possession of such information and had such opportunities to acquire knowledge of that particular (the bond issue and the payment of debt from its proceeds), that he "ought to

have known it," and thus, having acquired the stock and the political support of the paper, he should be held under that statute "to have consented to all the obligations," and must pay the note, and that "nowhere does the court submit to the jury the question whether Bruegger, from all the evidence, ought to have known of the bond issue and the payment of the debts in that manner." Counsel's whole argument assumes that some duty rested upon Bruegger to investigate and know that Hollister was violating his contract contained in the escrow agreement. Bruegger was under no such obligation. If he delivered this note under that agreement, and the jury found he did, he could have gone to South Africa without waiving any right of his to insist upon full compliance and strict performance by Hollister and the News Printing Company of the escrow agreement. Such performance was a condition precedent on the part of payee to a delivery of the note. The same rules apply to the delivery of a promissory note as to a deed. The condition precedent to the delivery, that is, the second delivery by the escrow holder, must be performed as a condition precedent to the validity of the instrument. There can be no middle ground or partial compliance sufficient as a substantial performance of the escrow agreement. Strict and full performance only can discharge the condition precedent to valid delivery by the escrow holder. Thornhill v. Olson, 31 N. D. 81, L.R.A.1916A, 493, 153 N. W. 442.

The further exception is taken based upon a refusal to instruct that "if Bruegger had knowledge of the facts when he wrote the letter of November 21, 1910 (offering to renew the note), he thereby ratified the transaction, and cannot now defend against the note." The same question was raised on denial of a motion for a directed verdict. The instruction was properly refused because Bruegger, shortly before the writing of this letter, might have learned the facts and thereupon written plaintiff as he did without ratifying the violation of the escrow agreement and estopping himself to assert that defense, inasmuch as the positions of the parties were in no wise changed subsequent thereto or to the plaintiff's injury or disadvantage in reliance thereon. If the written promise to pay contained in the original note did not bind Bruegger, the mere offer to renew, soon afterward repudiated, did not

estop him under the circumstances in this case. On this question the instructions of the court were more favorable than plaintiff was entitled to, and error was committed against Bruegger.

Plaintiff contends that it discharged the first mortgage and guaranty under the belief that Bruegger's note should be used as it was used. This however does not estop defendant because, concededly, he had done nothing at that time, July, 1910, upon which to base an estoppel against him. He knew nothing of the fact as found by the jury, of Hollister's violation, shortly prior thereto, of the escrow agreement. And the same is true of his acceptance and retention of the shares of stock transmitted him about the same time, and of any political support rendered him by the newspaper.

The court denied a new trial on alleged newly discovered evidence; the evidence offered is not newly discovered and was either a rehearsal of Hollister's testimony and claims at the trial and merely cumulative and what defendant's witnesses have testified to, or should have been inquired of at the trial. McAndress, whose affidavit is relied on for a new trial, was one of the witnesses testifying on two different days at the trial. A new trial should not be granted simply because a defeated party has failed to offer all the proof he had at hand. The point is without merit.

· Error is assigned because of denial of plaintiff's motion to direct judgment against the News Printing Company and thus eliminate from the case the consideration of the liability of the News Printing Company. This objection is trivial and technical. What plaintiff asked in effect was done and plaintiff's motion was granted by the instructions to the jury to return a verdict against the News Printing Company in any event, as was done.

After a careful review of alleged error assigned, none warranting a reversal is found. The judgment is ordered affirmed.

Fisk, Ch. J., disqualified. Hon. W. C. Crawford, District Judge, participated.